```
 1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF TEXAS
 2                  CORPUS CHRISTI DIVISION

 3
    FLOWBEE INTERNATIONAL, INC.,     *    CIVIL ACTION
 4  AND FLOWBEE HAIRCUTTER LIMITED   *
    PARTNERSHIP,                     *    CA-C-09-199
 5                                   *
             PLAINTIFFS,             *
 6                                   *
    VS.                              *
 7                                   *    CORPUS CHRISTI, TEXAS
    GOOGLE, INC.,                    *    SEPTEMBER 23, 2009
 8                                   *    1:08 P.M.
             DEFENDANT.              *
 9  * * * * * * * * * * * * * * * *  *

10

11         TRANSCRIPT OF INITIAL PRETRIAL CONFERENCE

12       BEFORE THE HONORABLE JANIS GRAHAM JACK
                UNITED STATES DISTRICT JUDGE
13

14  APPEARANCES:

15  FOR THE PLAINTIFFS:        MR. DAVID TARRANT BRIGHT
                               WATTS, GUERRA & CRAFT, L.L.P.
16                             555 NORTH CARANCAHUA, SUITE 1400
                               CORPUS CHRISTI, TEXAS 78478
17
    FOR THE DEFENDANT:         MS. MARGARET CARUSO
18                             QUINN, EMANUEL, URQUHART, OLIVER &
                               HEDGES, L.L.P.
19                             555 TWIN DOLPHIN DRIVE, SUITE 560
                               REDWOOD SHORES, CALIFORNIA 94065
20
               (APPEARANCES CONTINUED ON PAGE 2)
21

22  COURT RECORDER:            MS. VELMA GANO

23
          PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
24        TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
                  MOLLY CARTER, P. O. BOX 270203
25        CORPUS CHRISTI, TEXAS 78427 (361) 945-2525
```

(APPEARANCES CONTINUED ON PAGE 2)

```
 1    APPEARANCES:  (CONTINUED)

 2
      FOR THE DEFENDANT:          MR. CARL C. BUTZER
 3                                JACKSON WALKER, L.L.P.
                                  901 MAIN STREET, SUITE 6000
 4                                DALLAS, TEXAS 75202

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1            (The proceedings began at 1:08 p.m.)

2            (Call to Order of the Court.)

3            THE CLERK:  Court calls Civil Action C-09-199,

4    Flowbee International, et al. versus Google, Inc.  May I have

5    appearances, please?

6            MR. BRIGHT:  Good afternoon, Your Honor.  David

7    Bright here on behalf of the Plaintiffs.

8            MS. CARUSO:  Good afternoon, Your Honor.

9            THE COURT:  Good afternoon.

10           MS. CARUSO:  Margaret Caruso, from Quinn, Emanuel,

11   Urquhart, Oliver & Hedges, on behalf of Google, Inc., the

12   Defendant.

13           MR. BUTZER:  Good afternoon, Your Honor.  My name is

14   Carl Butzer.  I'm also here representing Google, Inc.  And I'm

15   with Jackson Walker.

16           THE COURT:  I wanted to call you Mr. Bright.  I just

17   couldn't.

18           MR. BRIGHT:  That's very kind of you, Your Honor.

19           THE COURT:  I did contact your parents, though.

20           So you have a motion to dismiss --

21           MS. CARUSO:  Yes, Your Honor.

22           THE COURT:  -- right?  And I did sign last night

23   sometime your --

24           MS. CARUSO:  Thank you very much, Your Honor.

25           THE COURT:  -- to appear.  And I guess the question
```

1   is whether this arises out of the contract or just a plain old

2   trademark infringement, if that's what they're going on.

3           MS. CARUSO:  I believe -- would you like --

4           THE COURT:  Mr. Bright?

5           MR. BRIGHT:  Your Honor, our deadline for responding

6   has not expired, and we will be vigorously contesting it.  Our

7   position --

8           THE COURT:  I know, but I do all pending motions at

9   the initial pretrial conference.

10          MR. BRIGHT:  We intend to file a full-blown response.

11  This motion was just filed a week ago.  Let me first say, it's

12  going to be our position, and I think it's going to be born out

13  by the facts, that this suit does not arise out of that

14  contract.  The contract's not mentioned in the suit.  The

15  conduct complained of by Google predates this click-through

16  contract.  There may be conflicting terms in various click-

17  through contracts.

18          THE COURT:  But you're not relying on the contract

19  for this.  You're relying on trademark infringement.

20          MR. BRIGHT:  That is absolutely correct, Your Honor.

21          THE COURT:  That's what I thought, reading through

22  your petition.  So I'm not sure if the forum selection clause

23  in the contract controls.  But I'll give you a chance to

24  respond to his response.

25          MS. CARUSO:  Okay.  Your Honor, I, Google agrees that

1    their complaint is based on trademark infringement.  It does

2    not arise out of the contract.  However, the forum selection

3    clause is broader than the scope of the contract alone.  It

4    goes beyond just the parties' relationship under the contract,

5    if you look at the words, to all claims arising from or

6    relating to the agreement and --

7              THE COURT:  Okay.  I can -- let me say this.

8              MS. CARUSO:  Sure.

9              THE COURT:  I can Google my name on Google.

10             MS. CARUSO:  Yes.

11             THE COURT:  And come up with lots of stuff.  And if I

12   found that you were putting my name with someone else, I would

13   have some kind of a cause of action.  It might be some kind of

14   slander cause of action.  And that forum selection clause would

15   not apply to me, because I didn't have a contract with you.

16             MS. CARUSO:  But if --

17             THE COURT:  So tell me the difference.

18             MS. CARUSO:  The difference is that Flowbee, the

19   Plaintiff, does have a contract with us, an advertising

20   contract.  And as one of the terms of that contract, they

21   agreed that any dispute relating to Google's advertising

22   programs would be brought in California, in the courts of Santa

23   Clara County.  And there is a case, from the Northern District

24   of Texas --

25             THE COURT:  You're going to rely on the law for this?

1    Don't you hate that?

2              MR. BRIGHT:  That's terrible.

3              MS. CARUSO:  The Northern District of Texas, Your

4    Honor, but there aren't many cases --

5              THE COURT:  I know.

6              MS. CARUSO:  -- addressing broader claims than, forum

7    selection clauses than just the ones arising from the contract

8    or relating to the contract.  But in that case, it did go

9    beyond just the contract.  And the Court pointed out that the

10   test of whether or not the action arises from the contract and

11   the contractual relationship or could have been brought outside

12   of the contractual relationship doesn't apply when the terms of

13   the forum selection clause go beyond that relationship.  That's

14   one of the terms that Flowbee agreed to in the contract, just

15   like they agreed to other terms, such as that they weren't

16   going to scrape or extract any data from Google's website in

17   connection with what they do.

18             THE COURT:  Okay.

19             MS. CARUSO:  So whatever ability they could have had

20   to do that, they gave that up in exchange for advertising on

21   Google's website.

22             THE COURT:  Okay.  Well, we'll see.

23             MS. CARUSO:  Okay.

24             THE COURT:  We'll see what I come up with, because I

25   don't know, because I figured that's what they were going to

1    say, is that this had nothing to do with the contract.  But now

2    what you're saying is that the relationship is broader than

3    just the contractual relationship.

4             MS. CARUSO:  The forum selection clause is broader.

5             THE COURT:  The forum selection clause.

6             MS. CARUSO:  Yes.

7             THE COURT:  Okay.

8             MS. CARUSO:  Exactly, Your Honor.

9             THE COURT:  Okay.

10            MR. BRIGHT:  And we will be filing --

11            THE COURT:  I believe it.

12            MR. BRIGHT:  -- a lengthy --

13            THE COURT:  And I'll wait, excited --

14            MR. BRIGHT:  With bated breath.

15            THE COURT:  -- to hear from everybody, because it's a

16   great issue.  And I don't want y'all to go away, but you know,

17   there you have it.

18            MR. BRIGHT:  It's an interesting case.

19            MS. CARUSO:  We're happy to come back and talk more

20   about that.

21            THE COURT:  So what about the scheduling order?  Is

22   that okay?

23            MS. CARUSO:  Yes, Your Honor.

24            MR. BRIGHT:  It is indeed.  We work together

25   famously, Your Honor.

1          THE COURT:  Good.  Then I'll go ahead and sign the

2   scheduling order, which also adopts your Joint Discovery Case

3   Management Plan.

4          MS. CARUSO:  Thank you.

5          THE COURT:  And then I'm going to give you a general

6   order that you might want to use, instead of going back and

7   forth.  I'm going to give you a mediation order.  And you've

8   not been here before, so I'll tell you a little bit.  I'm going

9   to enter a general order, too, that tells about my mediation

10  policy and the discovery policy.

11          In the mediation order, you pick your own mediator,

12  you pick your own time for mediation.  If it doesn't work out,

13  if you can't agree on a mediator, you can come back to me and

14  I'll appoint one.

15          MS. CARUSO:  All right.

16          THE COURT:  That's never happened.  Y'all know best

17  who can mediate these kind of things, where you want it done,

18  and when you'll be ready for it.

19          Now, I put a date in here for the order for referral

20  to mediation to notify the Court no later than X date.  That

21  you can change by agreement.  In the general order, you can

22  also change all these dates by agreement, as long as it's not

23  the ones I tell you you can't change, trial, final pretrial

24  conference, dispositive motions deadline, because those, I kind

25  of figure, are mine.

1             Now, the discovery policy is this. It's in the

2 general order, but if you have a discovery problem, you just do

3 a joint call to Ms. Scotch, and she'll have you in to the court

4 within an hour or two, wherever I am, vacations, Timbuktu,

5 literally anywhere.

6             So with that in mind, do you all have any present or

7 anticipated discovery problems?

8             MS. CARUSO: Not at this time, Your Honor.

9             MR. BRIGHT: We haven't propounded any discovery yet,

10 Your Honor. We have a --

11             THE COURT: Do you think I can deny their motion to

12 dismiss just because it would be fun for me to try it?

13             MR. BRIGHT: I think that's a sound basis, and I will

14 find a case that supports that.

15             THE COURT: A sound legal decision?

16             MR. BRIGHT: It is an interesting case, I will say

17 that, Your Honor.

18             THE COURT: All right. Anything else, while you're

19 here?

20             MR. BRIGHT: Your Honor, only if the Court is

21 interested. In anticipation of, having attended some other

22 pretrial conferences --

23             THE COURT: Oh, you have a PowerPoint for me. I'd

24 love to see it.

25             MR. BRIGHT: Only if you're interested in --

1          THE COURT:  I'm interested.

2          MR. BRIGHT:  Well, then I will --

3          THE COURT:  Thank you.

4          MR. BRIGHT:  -- show you what this case is about.  I

5    anticipated you might ask what this case is about.  And with

6    that in mind --

7          THE COURT:  Well, I figured out what it was about.  I

8    did my own little Google search to see what popped up.  I was

9    fascinated about the hair thing.  Have you used it?

10          MR. BRIGHT:  Obviously not, Your Honor.

11          THE COURT:  Okay.  Well no, I mean, you look so nice

12    and --

13          MR. BRIGHT:  Although, I will say that there is a,

14    among --

15          THE COURT:  It's like a science fiction story, isn't

16    it?

17          MR. BRIGHT:  It is a little bit.

18          THE COURT:  Vacuuming your hair and cutting it?

19          MR. BRIGHT:  If I'm not mistaken --

20          THE COURT:  Doesn't that take care of everything at

21    the same time?

22          MR. BRIGHT:  You know, I don't think I'm talking out

23    of school.  Jon Muschenheim used this piece of equipment, with

24    apparent success for years, and might still to this day.

25          THE COURT:  No.

```
 1              MR. BRIGHT:  I will not lie.

 2              THE COURT:  You know, that's why we were talking

 3    about this years ago.  We know this, didn't we?  Because we

 4    looked, I looked up because Mary Hardin, who's the Court

 5    Administrator, she said, "This sounds so familiar."  So we

 6    looked up to see if we had had another Flowbee case, and no, I

 7    think we were talking about Muschenheim.  Don't you think,

 8    Ms. Gano?

 9              COURT RECORDER:  I know he's --

10              THE COURT:  That's what it was.

11              MR. BRIGHT:  U.S. Attorney approved, Your Honor.

12              THE COURT:  Okay.  So tell me.

13              MR. BRIGHT:  Your Honor, I have a notebook.  I've

14    given them to opposing counsel.  It contains an initial trial

15    brief and also has the slides of this PowerPoint presentation,

16    if I can present that.

17              THE COURT:  Thank you.  Any objection?

18              MS. CARUSO:  Your Honor, we just, you know, saw this

19    five minutes ago, but we're happy to --

20              THE COURT:  Well, if you object to it, it's fine.  I

21    won't look at it.  I'll just look at the presentation.

22              MS. CARUSO:  Um --

23              THE COURT:  It's going to hurt his feelings, though.

24              MS. CARUSO:  The objection is the same either way

25    for --
```

```
 1              THE COURT:  It's going to hurt his feelings terribly.
 2              MS. CARUSO:  We're fine with you seeing it.  We would
 3   like to respond, and perhaps at some later opportunity to
 4   present our own PowerPoint explaining our side.
 5              THE COURT:  That would be fine.
 6              MR. BRIGHT:  I don't think they should be able to
 7   respond.
 8              THE COURT:  No response?  Oh, you just missed the
 9   response deadline.  Okay.  This is so much better than
10   sentencing people.
11              MR. BRIGHT:  I've got to tell you, Your Honor, it's
12   much better than being sentenced.
13              THE COURT:  Uh-huh, uh-huh.
14              MR. BRIGHT:  This is fairly brief, Your Honor.
15   Flowbee, as I described, is a vacuum hair cutting system.  It
16   is a, as seen in *Wayne's World*, it is a patented hair cutting
17   system.  More importantly, perhaps, for purposes of this case,
18   Flowbee, the word "Flowbee" is a coined term.  In other words,
19   it means nothing but what you see there.
20              THE COURT:  Okay.
21              MR. BRIGHT:  It's not a generic term.  It doesn't
22   mean --
23              THE COURT:  It's a mark.
24              MR. BRIGHT:  It's not only a mark, but as opposed to
25   McDonalds, which is also a last name, Flowbee only refers to
```

1   this thing.  It's a made-up word.

2           THE COURT:  Okay.

3           MR. BRIGHT:  So it's perhaps, you know, like Kleenex,

4   which of course Kleenex has actually sort of become

5   genericized.

6           THE COURT:  That's right.

7           MR. BRIGHT:  But it is a coined, made-up word.

8   Flowbees have been sold very successfully on infomercials on

9   television and also through the internet.  That's a screen shot

10  of Flowbee's internet --

11          THE COURT:  Well, do women use them?  I mean, how do

12  you do it for long hair?

13          MR. BRIGHT:  Yes, absolutely.  In fact, Theresa

14  Swerenko is another happy Flowbee -- the former Mrs. --

15          THE COURT:  I don't know her.

16          MR. BRIGHT:  The former Mrs. Jon Muschenheim, who had

17  very similar hair.

18          THE COURT:  Oh.  Oh, similar to his, though.

19          MR. BRIGHT:  Yes.

20          THE COURT:  Yeah.  Well no, I meant long hair.

21          MR. BRIGHT:  I don't know.  I'm sure it's adjustable.

22          THE COURT:  It looks kind of dangerous.

23          MR. BRIGHT:  Well, you know, Mike Westergren is one

24  of the people who will --

25          THE COURT:  Don't tell me he uses it, because I don't

```
1    believe it.

2              MR. BRIGHT:  His hairs are precious to him.

3              THE COURT:  I know.  And precious few, if I remember.

4              MR. BRIGHT:  They're more precious than -- I

5    shouldn't be saying this on the record.  A number of our claims

6    pertain to Google's sponsored links.  And Your Honor, there's

7    been actually a pretty good track record of litigation

8    regarding this, not only in the Federal District Court in the

9    Northern District of Texas, which is within the Fifth Circuit,

10   of course, but also in the Second Circuit and the Ninth and the

11   Tenth and other places, about the sponsored links.

12             And this is what happens.  You get to the Google

13   page, and you Google "Flowbee."

14             THE COURT:  Okay.

15             MR. BRIGHT:  It's F-L-O-W-B-E-E.  It only means that

16   one patented thing that you saw.

17             THE COURT:  Okay.  So what comes up?

18             MR. BRIGHT:  This is what comes up when you Google

19   "Flowbee."  You Google that and you get $40 sale vacuum hair

20   cutter right up at the top.  That is --

21             THE COURT:  Oh, and that's the top one.  And do you

22   pay -- I assume that you kind of pay for how you go in the

23   line?

24             MR. BRIGHT:  That is a purchased, sponsored link by

25   Flowbee's competitor, RoboCut.  In other words, RoboCut --
```

1           THE COURT:  Okay.  So the annoying thing is, is that

2    when you Google "Flowbee," you should get Flowbee first.

3           MR. BRIGHT:  You certainly would expect that, because

4    otherwise that's why people use Google, because there's an

5    assumption that the search algorithm is such that the most

6    relevant search result will be first.

7           THE COURT:  At the top, yeah.

8           MR. BRIGHT:  And there's another aspect of it, and

9    that is that if you Google, for example, "David Bright," I

10   would assume you would get any number of "Davids," any number

11   of things that contain the word "bright," and maybe a whole

12   passel of "David Brights."

13          When you Google "Flowbee," no part of "$40 sale

14   vacuum hair cutter" sounds like "Flowbee."  If you got a water

15   park or something, you know, maybe.  But you know, it's

16   Google's position that since this is a, what's called a

17   sponsored link, that, you know, that's clearly an

18   advertisement.  I don't think that "sponsored link" -- I mean,

19   sponsored by whom?  It's certainly our position that that is --

20          THE COURT:  Okay.

21          MR. BRIGHT:  -- if not absolutely misleading --

22          THE COURT:  This is good.

23          MR. BRIGHT:  -- certainly has the capacity to

24   mislead.  If you -- this is Google Images.  And what do you

25   get?  You get the competitor, right up at the top.  This is if

1    you Google "Flowbee" on Google Maps, there's their competitor

2    at the top.  If you Google, Google News, you're going to get

3    their competitor there.  And again --

4           THE COURT:  Have you seen their contract, the

5    competitor's contract?

6           MR. BRIGHT:  No, I have not, Your Honor.

7           THE COURT:  You're entitled to that under Rule 26.

8           MR. BRIGHT:  I believe so, Your Honor.

9           THE COURT:  So --

10          MR. BRIGHT:  And --

11          THE COURT:  That's it.

12          MR. BRIGHT:  Thank you, Your Honor.

13          THE COURT:  That's what I'm telling you.  That should

14   be part of the Rule 26 disclosures from the Defendant.

15          MR. BRIGHT:  Google product search, Google "Flowbee,"

16   and again you're Googling a coined term, here's Google Groups,

17   it's up at the top --

18          THE COURT:  Does Yahoo -- did I read that Yahoo now

19   uses Google to Google, I mean, to search words, phrases and

20   things?

21          MR. BRIGHT:  I don't know the answer to that

22   question.

23          THE COURT:  So Google was going to buy Yahoo.  Right?

24   And Yahoo said no.  And then they said, "Oh, forget about it.

25   We'll just use Google to, in our search."  Is that --

1          MS. CARUSO:  I'm not sure about that, Your Honor.

2          THE COURT:  Okay.  Maybe I just made that up.

3          MS. CARUSO:  I think perhaps Microsoft has an

4   arrangement with Yahoo concerning their search systems.  But I

5   don't believe that Google does in that fashion.

6          THE COURT:  I thought -- okay.  You would know.  I

7   just wondered if it was some kind of a contract between all

8   these things that changed things around.

9          MR. BRIGHT:  Actually, this has been going on since,

10  if I'm not mistaken, 1994 maybe is when Google started selling

11  trademark terms as trigger search words.  If I'm not mistaken,

12  I have it in my notes, but they sell various words to trigger,

13  you know, search results --

14         THE COURT:  Well, they must have sold "Flowbee" to

15  that competitor.

16         MR. BRIGHT:  Unquestionably.

17         THE COURT:  One would assume.  But I'm going to hear

18  something different, I imagine.

19         MR. BRIGHT:  I don't know that they're, I don't

20  believe that they are disputing that Google sold --

21         THE COURT:  Flowbee.

22         MR. BRIGHT:  -- the use of the word "Flowbee" to

23  Flowbee's competitor.  I think they're --

24         THE COURT:  This is just a sad situation when you

25  can't trust Google.

```
 1              MR. BRIGHT:  If you Google "Flowbee.com," that's what
 2    this is, Flowbee.com --
 3              THE COURT:  Huh-uh.
 4              MR. BRIGHT:  -- you get 40 -- I'm not saying if you
 5    put it up in the URL.  I'm saying if you Google
 6    "Flowbee.com" --
 7              THE COURT:  I got it.
 8              MR. BRIGHT:  -- you get the competitor at the top.
 9    If you Google something close to Flowbee, which is like leave
10    the W out --
11              THE COURT:  Uh-huh.
12              MR. BRIGHT:  -- there's their competitor.  If you
13    Google "F-L-O-W-B-E," leave an E out and misspell it, you get
14    their competitor.
15              THE COURT:  Okay.  I got it.
16              MR. BRIGHT:  How about, quote --
17              THE COURT:  Move on.
18              MR. BRIGHT:  "Flowbee haircut system."
19              THE COURT:  Okay.
20              MR. BRIGHT:  Clearly you're going to get the
21    Flowbee -- no, you're going to get competitor, competitor,
22    competitor.
23              THE COURT:  Okay.
24              MR. BRIGHT:  In terms of whether it's confusing, I
25    don't -- I don't know why a person wouldn't assume that that
```

```
 1    $45 sale vacuum hair cutter was Flowbee.

 2            THE COURT:  Was Flowbee.  Yeah, I would.

 3            MR. BRIGHT:  What does Google say?  Google --

 4            THE COURT:  But I'm not good at this either.

 5            MR. BRIGHT:  On Google's AdWords learning center,

 6    where they sell these search terms to people --

 7            THE COURT:  Okay.  I just think she ought to just

 8    turn her pockets out and be done with it.

 9            MR. BRIGHT:  Well, I don't want her money, Your

10    Honor, just her client's.

11            THE COURT:  Okay.

12            MR. BRIGHT:  But one of the things Google says to

13    people that do business with them, they say who, you know, for

14    example --

15            THE COURT:  Okay.

16            MR. BRIGHT:  -- RoboCut.  Let's say the competitor,

17    who availed themselves of this AdWords program, once you

18    activate your account, RoboCut, your ads will be eligible to

19    appear.  That is, the AdWords system will constantly seek out

20    search queries related to the key words you've selected.  In

21    this case, they've selected trademark term "Flowbee."  Then

22    display your ads to highly targeted audiences.  In short, you

23    would be advertising directly to an audience already looking

24    for you.  In other words, this is Google's --

25            THE COURT:  Got it.  Is that in your contract?
```

1              MR. BRIGHT:  No.  This is actually on the Google

2    learning center page --

3              THE COURT:  Okay.

4              MR. BRIGHT:  -- for the AdWords.  If you're

5    interested in buying AdWords through Google, such as Flowbee,

6    they're saying in short, RoboCut, you're advertising directly

7    to an audience already looking for Google, I mean for --

8              THE COURT:  Flowbee.

9              MR. BRIGHT:  -- Flowbee.  Pardon me.

10             THE COURT:  Got it.

11             MR. BRIGHT:  In contrast, if you go to the Google

12   page, you Google the word "Google," you see no such sponsored

13   links on there.  You don't see anything for bing.com or

14   Yahoo --

15             THE COURT:  Yahoo.

16             MR. BRIGHT:  -- or Dogpile.

17             THE COURT:  Well, that's because they hadn't paid

18   them.  Yahoo hasn't paid them.

19             MR. BRIGHT:  If they would allow them to do that in

20   the first place.

21             There's also the Google AdSense program, which allows

22   people with websites to display targeted Google ads on their

23   own websites.  Now, with respect to this, we talked about the

24   F-L-O-W-B-E.com, where you had the competitor show up.  In

25   addition, you're directed to a website that is F-L-O-W-B-E.com.

Case4:10-cv-00668-LB   Document21   Filed09/25/09   Page21 of 39

21

1    And on information and belief, we think these are, this is a

2    website which has availed itself of the AdSense, you know,

3    Google's AdSense campaign.  You see Flowbee on there that is

4    correctly spelled.

5                THE COURT:  Who did that website?  Do you know the --

6                MR. BRIGHT:  We don't know.  I mean, we have a -- I

7    think that's something we're going to have to be assessing out

8    in discovery.

9                THE COURT:  Okay.

10                MR. BRIGHT:  But, I mean, we can find out who did the

11   website and we know the name of some company, but we don't

12   know --

13                THE COURT:  What's the name of the company?

14                MR. BRIGHT:  Oh, I have it in my notes, Your Honor,

15   and I'm not sure.  I mean, it's a very generic sounding name,

16   you know.

17                THE COURT:  That did the website?

18                MR. BRIGHT:  Yes, that did this F-L-O-W-B-E website.

19   But on it --

20                THE COURT:  Could you look it up and find out?

21                MR. BRIGHT:  I don't know that I have that -- I know

22   that we did look it up, and I know that we did come up with

23   that information.

24        (PAUSE.)

25                THE COURT:  Go ahead.  I'm watching.

```
1              MR. BRIGHT:  Oh, pardon me.  The interesting thing is
2     here we see Flowbee correctly spelled, F-L-O-W-B-E-E.  You
3     click on that, and you get to this page that has the Flowbee
4     search request, and it is chock full of competitors.
5              THE COURT:  That's the same as the one without the E.
6              MR. BRIGHT:  Right.  But when you, if you go to
7     this --
8              THE COURT:  That thing at the top left?
9              MR. BRIGHT:  If you go to this F-L-O-W-B-E.com, in
10    other words, the misspelled --
11             THE COURT:  Yeah.
12             MR. BRIGHT:  -- Flowbee, you get to this website that
13    is F-L-O-W-B-E.com, which doesn't mean anything.  Flowbe, it's
14    not even a coined term or anything else.  It's a misspelling of
15    Flowbee.  And it is our belief that the owner of this website
16    has availed itself of the AdSense campaign that Google has
17    which allows these links that you can buy from Google.  And if
18    you click on that Flowbee link there that is correctly
19    spelled --
20             THE COURT:  Okay.
21             MR. BRIGHT:  -- you end up with competitors.  And
22    this again is something we're going to have to do some serious
23    discovery on, but that's something that's of great concern.
24             And I have a discussion of the applicable state and
25    federal law, if the Court is interested in it.  It's also
```

1    included in our brief and in our petition, if you're interested

2    in the various causes of action.

3              THE COURT:  I read all of it, I promise.

4              MR. BRIGHT:  Well, in that case, I won't belabor

5    that, Your Honor.  So there you have it.

6              THE COURT:  Now, don't you think she can respond now?

7              MR. BRIGHT:  Certainly.

8              THE COURT:  Are you done?

9              MR. BRIGHT:  I am, Your Honor.

10             THE COURT:  Okay.  Thank you, Mr. Bright.

11             MS. CARUSO:  Thank you, Your Honor.  I didn't come

12   prepared with slides, but I would like to address a few of the

13   points, just so you can understand --

14             THE COURT:  I saw you were making notes to tell me.

15   Yes, please.

16             MS. CARUSO:  -- the context here.

17             First of all, as noted, I think it would be an

18   interesting case to see through, and perhaps someone else who

19   doesn't have a contract with Google will sue us here, and we

20   can be back.

21             THE COURT:  Very diplomatic.  Thank you.

22             MS. CARUSO:  You know, one thing that, when you were

23   talking earlier about Kleenex, I think it provides a useful

24   analogy for what we're talking about here, and to understand

25   how it is that sponsored links work for the searcher.

```
 1                THE COURT:  Because I imagine if I put in Kleenex, I
 2      would get not just Kleenex, but Scott Tissues and all the
 3      other --
 4                MS. CARUSO:  Probably so, much like if you went to
 5      Wal-Mart or --
 6                THE COURT:  But I don't know if they still have a
 7      mark, if Kleenex still has a mark.
 8                MS. CARUSO:  I believe that they do.  At least they
 9      present it that way.
10                THE COURT:  Okay.
11                MS. CARUSO:  If you were to go into a drug store and
12      say, "Where do you keep the Kleenex," it's not necessarily that
13      you want to purchase Kleenex brand tissue.
14                THE COURT:  Uh-huh.
15                MS. CARUSO:  It's that you want to know where that
16      type of product is kept.  Or maybe you have it in your head
17      that you do want Kleenex, but when you go to that section that
18      has the tissue, you decide, you know, this one has lotion in
19      it.  Maybe I want that one instead.  It has some features I
20      hadn't thought about.  Or this one has a better price, and
21      that's my primary driving point.
22                So it's useful to have all of those relevant things
23      in one place, because not everyone who types in, "I'm looking
24      for Kleenex," is looking just to buy Kleenex.  They might be
25      doing some competitive shopping as well.
```

1   They also might be looking for, you know, a lot of

2   the examples here were of competitors.  But those aren't, of

3   course, the only types of sponsored links there are.  There

4   could be people who have news stories about that product,

5   customer reviews of that product.  So there's a lot of

6   information, relevant information to a trademark product that

7   can be gotten from this search term.  And that's what Google is

8   interested in providing.

9   And in terms of the sponsored links, Mr. Bright

10  referred continuously to Google selling words.  And Google

11  recognizes that it doesn't have, it doesn't own those

12  trademarks.  It does not sell those trademarks.

13  THE COURT:  Well, what do you do?  I thought it was

14  just a search engine.

15  MS. CARUSO:  It is a search engine.  So what we do in

16  the AdWords program, Google offers the --

17  THE COURT:  Don't you buy, I mean, I've heard this, I

18  didn't know it was true, but I've heard that you, you're able

19  to buy kind of a slot in the deal.  When you look up Kleenex,

20  you can buy your position.

21  MS. CARUSO:  It's a little bit, not exactly that.

22  THE COURT:  Can you -- no?

23  MS. CARUSO:  I'll talk a little bit about it.

24  THE COURT:  Okay.

25  MS. CARUSO:  So what happens if you decide to become

1    an AdWords advertiser?  You get various information from Google

2    about how your account is going to work.  Mr. Bright had one of

3    those terms up here --

4              THE COURT:  Okay.

5              MS. CARUSO:  -- that applies to all AdWords

6    advertisers, Flowbee included.  And you identify key words.  So

7    the whole point of AdWords is to provide relevant advertising

8    to the consumers --

9              THE COURT:  So you would put vacuum, hair cutter,

10   Flowbee, because that's the biggest, like the Kleenex, of the

11   vacuum hair cutter industry.

12             MS. CARUSO:  Right.  You might choose to enter those

13   as the key words.

14             THE COURT:  And say, "I want to come up under these

15   searches."

16             MS. CARUSO:  And then you have the opportunity to

17   bid, to tell Google, "I'm willing to pay X amount of money for

18   every click that someone makes when my ad is displayed, in

19   connection with that key word."

20             THE COURT:  So if that competitor that he kept

21   showing that comes up first paid more money than Flowbee --

22             MS. CARUSO:  It may or may not be the case, because

23   it's not driven solely by price.  There is an algorithm that

24   Google uses, and it's a combination of relevance and price.

25   And that algorithm is much more complicated than I could

1   explain to you.

2              THE COURT:  Is that a trade secret?

3              MS. CARUSO:  I believe it is, Your Honor.  It's --

4   and it's what enables Google to display that information.

5   Because from Google's perspective, it's in everyone's interest

6   to have the most relevant information be displayed.

7              So if you wanted to bid on the Flowbee mark, but

8   you're selling your services as a mediator, for example, you

9   could, you know, bid "I'll pay $20 a click for people who are

10  looking for Flowbee.  There's a high correlation of Flowbee

11  users and people who need mediators."

12             THE COURT:  And mediators or whatever, okay.

13             MS. CARUSO:  But Google's, that's probably not going

14  to be highly rated, even if you're by and away the higher

15  bidder, because Google's going to look at the relevance of

16  that, their algorithm will look at the relevance of that site

17  and kind of the clicks --

18             THE COURT:  Well, do you tell your, do you tell

19  people when they enter into a contract with you that they're

20  going to be subject to these algorithms, and they may not be

21  the first person, even if that's their trademark name, they may

22  not be the first entity that comes up when their actual name is

23  Googled?

24             MS. CARUSO:  Yes.  Google has --

25             THE COURT:  You tell them all that?

```
 1                MS. CARUSO:  If you sign up for an AdWords account,
 2    you get numerous correspondence from Google explaining kind of
 3    here's how AdWords works.  And then there's a lot of questions
 4    and answers.  "My ad isn't showing up as high as I want it to
 5    be.  Why is that?"  And Google will give explanations.
 6                THE COURT:  Did you get an explanation, Mr. Bright,
 7    for your company, Flowbee?
 8                MR. BRIGHT:  I'm sorry, Your Honor?
 9                THE COURT:  Did Flowbee say, "Why is this happening?"
10                MR. BRIGHT:  No.  I think --
11                THE COURT:  They never contacted Google and said,
12    "Why is this happening?"
13                MR. BRIGHT:  I don't know that they did.  I don't
14    think it's that easy to get a response to -- I'm not sure if
15    you can get Mr. Google on the phone, but I think he --
16                THE COURT:  I've talked to him many times.
17                MR. BRIGHT:  I think he --
18                THE COURT:  And it's Ms. Google.
19                MR. BRIGHT:  My bad, Your Honor.  I think it's pretty
20    clear why this happens.  There's two different things we're
21    talking about.  One is if you're a lawyer who handles cases
22    involving foreclosures, you might want to bump yourself up on
23    the search, this generic search for foreclosure lawyers, or
24    foreclosure, or lawyers.  It's another thing when you're paying
25    money, as a competitor --
```

```
 1              THE COURT:  Okay.

 2              MR. BRIGHT:  -- paying money to pop up there.

 3              THE COURT:  I just, I didn't mean to interrupt her

 4    presentation, except for that one issue.  And I'll give you

 5    another chance to speak, if you would like.

 6              MR. BRIGHT:  Sure.

 7              THE COURT:  But I just wanted to know if you had

 8    complained to Google that this is happening, fix it.  Other

 9    than the suit.

10              MR. BRIGHT:  Well --

11              THE COURT:  So do you have any correspondence from

12    them, from Flowbee?

13              MS. CARUSO:  Not that we're aware, Your Honor.

14              THE COURT:  Okay.  You've talked to all the Googles?

15              MS. CARUSO:  Not every one of them, but we looked for

16    that.

17              So basically, that's how AdWords works.  And we,

18    Google's position, again, one of the things Mr. Bright said

19    when he had the screen shot up and pointed to, he circled in

20    red the sponsored link language.

21              THE COURT:  Right.

22              MS. CARUSO:  That's something that, you know, as he

23    said, it's clearly sponsors, clearly paid-for advertising.  So,

24    and there's the shading beneath that as well.  You would think

25    that calls out to customers this is not the natural search
```

```
 1    result.  This is giving you something that's sponsored.  Just

 2    like you know that when you have a football game that's

 3    sponsored by something, or a game show, they say, "Please

 4    support our sponsors," we know that sponsors mean paid for.

 5              THE COURT:  But if you Google "Flowbee" --

 6              MS. CARUSO:  Uh-huh.

 7              THE COURT:  -- does that not come up as sponsored

 8    link first?

 9              MS. CARUSO:  It depends, Your Honor, actually on --

10    there are -- because of the way the algorithm works, it's not

11    always going to show up the same way every day.

12              THE COURT:  It will be different every day?

13              MS. CARUSO:  But so some days --

14              THE COURT:  If I Google it right now, I've got on

15    Google --

16              MS. CARUSO:  Okay.

17              THE COURT:  -- and I put in "Flowbee," and we'll see

18    what comes up.

19              MS. CARUSO:  All right.

20              THE COURT:  Flowbee haircut system, first thing.

21    Uh-oh.  Are you the $45 RoboCut?

22              MR. BRIGHT:  That's our competitor, Your Honor.

23              THE COURT:  Flowbee -- no, it says "Flowbee" with a

24    trademark.

25              MS. CARUSO:  Your Honor, I believe --
```

1          THE COURT:  Is that your competitor?  Come look at

2    this.  You all come look at this and see what this is.  I don't

3    see how that could be your competitor.

4          MR. BRIGHT:  That is our competitor.  It says,

5    "Flowbee, $45 RoboCut," and that is not us, Your Honor.

6          MS. CARUSO:  So, Your Honor, I think that this site,

7    haircut compare, if you click on it, I think it compares

8    Flowbee to RoboCut.

9          THE COURT:  Okay.

10          MS. CARUSO:  So it --

11          MR. BRIGHT:  That is RoboCut's website.

12          MS. CARUSO:  So it's using --

13          THE COURT:  Oh, so that's RoboCut's website?

14          MR. BRIGHT:  RoboCut has that website.

15          THE COURT:  Oh.  So if I -- I'm just Googling

16    "Flowbee."  And what comes up is the sponsored link --

17          MR. BRIGHT:  That is correct.

18          THE COURT:  -- with the competitor's website.

19          MS. CARUSO:  Right.  And this use, you know,

20    comparing Flowbee to RoboCut on the website, we submit, Your

21    Honor, is clearly fair use.  It's comparative advertising,

22    there are FTC guidelines --

23          THE COURT:  I've got it.  But it may be a little

24    unfair if I were Flowbee.  I'm just saying.  And I may not have

25    this case, you know, permanently, but --

```
1                    MS. CARUSO:  Right.

2                    THE COURT:  -- I would be annoyed.

3                    MS. CARUSO:  Well, Your Honor, the law is more

4       specific -- I know you didn't (inaudible) talked about earlier,

5       but annoyance isn't the test really.  It's whether or not

6       there's a likelihood of confusion that arises from this.  And,

7       you know, here you've got the Flowbee name and the RoboCut

8       name, and Haircut Compare is your URL there.  So this is a

9       comparison website.

10                   THE COURT:  Except it's RoboCut's website.

11                   MS. CARUSO:  It is, and they're free to compare the

12      two products, just like --

13                   THE COURT:  I understand.

14                   MS. CARUSO:  -- Coke is free to compare itself to

15      Pepsi, and Pepsi does a Pepsi challenge.

16                   THE COURT:  I would feel somewhat confused if I were

17      looking up Flowbee and got that for number one.  That's all I'm

18      saying.  And that is one of the legal issues --

19                   MS. CARUSO:  Yes, Your Honor, it certainly is.

20                   THE COURT:  -- is the possibility of confusion, or

21      the likelihood of confusion.

22                   MR. BRIGHT:  Correct.

23                   MS. CARUSO:  That's right, Your Honor.  That's the

24      key legal issue, and one that certainly will be addressed by --

25                   THE COURT:  In California, you think.
```

1          MS. CARUSO:  Yes.

2          THE COURT:  And it may be.  You may be right about

3    it.

4          MS. CARUSO:  -- by consumer studies and experts.

5          So because, you know, as consumers people bring

6    different ideas and perceptions into things.

7          THE COURT:  What are the damages?  You have to

8    disclose how many hits were made on that RoboCut versus

9    Flowbee?

10         MS. CARUSO:  Well --

11         THE COURT:  Is that it?  What are the damages?

12         MR. BRIGHT:  Well, it's the money that they have been

13   paid, it is the money that we have lost, and it is potentially

14   attorney's fees and exemplary damages, depending on --

15         THE COURT:  So you're going to have to look at

16   RoboCut.  Are you going to have to add them in and see how much

17   they've made off this?

18         MR. BRIGHT:  We don't anticipate doing that, Your

19   Honor.

20         THE COURT:  How else could you find out what you

21   lost, except for what they got?

22         MR. BRIGHT:  I suspect it will be the subject of

23   forensic accounting that can show when this practice started

24   and --

25         THE COURT:  I see.

```
 1              MR. BRIGHT:  -- how it affected our profits.

 2              THE COURT:  Okay.

 3              MS. CARUSO:  You know, it's a very interesting

 4    question, Your Honor.

 5              THE COURT:  It is, isn't it?

 6              MS. CARUSO:  Because, of course, the Plaintiff is

 7    very free to sue the competitor for -- they're the ones who

 8    chose to frame the ad the way that they did.

 9              THE COURT:  Except for you put it -- it was the

10    placement, is what he's saying, is that --

11              MS. CARUSO:  It was placed --

12              THE COURT:  Location, location, location.

13              MS. CARUSO:  It was placed pursuant to our algorithm,

14    that's correct.  They chose the words and they chose that

15    connection.  Flowbee has sued this competitor before, in

16    California.

17              THE COURT:  Really?

18              MS. CARUSO:  Yes.  So as you can see, though, I guess

19    maybe perhaps Google is perceived as having a bigger --

20              THE COURT:  A hand in it?

21              MS. CARUSO:  -- bank book.

22              THE COURT:  Okay.

23              MS. CARUSO:  So I'm happy to address anything else

24    Your Honor has questions on.

25              THE COURT:  No, I think you've done a wonderful job.
```

1    I appreciate it.

2              MS. CARUSO:  Thank you.

3              THE COURT:  And it's interesting.  You know, I wish

4    I -- I hope I get to keep the case, but I may not.  So anything

5    else?

6              MR. BRIGHT:  Only if you want us to start Round 2,

7    Your Honor.

8              THE COURT:  Do you want another round?

9              MR. BRIGHT:  If you like.  We operate at the pleasure

10   of the Court.

11             THE COURT:  It's up to you.  My time is your time.

12             MR. BRIGHT:  Well, I guess I would say this.  I don't

13   think the sponsored link is clear.  Google did a customer

14   survey to find out whether they ought to call this a sponsored

15   link or an advertisement, which is what it is, and they chose

16   sponsored links, because more people clicked on a thing that

17   said sponsored link than clicked on an advertisement.  You know

18   why?  Because I don't know what sponsored link means.  It means

19   sponsored by whom?  I mean, you --

20             THE COURT:  Sponsored by Google?  Sponsored by --

21             MR. BRIGHT:  Apparently sponsored by Google and paid

22   for by a competitor, competitors' paid advertisements with --

23             THE COURT:  I wouldn't know what it meant.  I

24   wouldn't have an opinion.

25             MR. BRIGHT:  And I think that's misleading.  I think

1    it's -- I think it has more value to the competitor.  RoboCut

2    gets more value out of that when it has "sponsored link"

3    than --

4            THE COURT:  I guess I was, I didn't know -- I figured

5    if I put in a "Flowbee," that I would get not a sponsored link

6    first, but I would get something else, like a natural word

7    search.  You know what I'm -- like you used to do in Westlaw.

8            MR. BRIGHT:  Which is why you use Google.  If you

9    thought that every time you did a search on Google you were

10   just going to come up with a mass of advertisements, nobody

11   would use it.  It's -- the stock and trade of Google is not

12   where they make all their money.  They make their money doing

13   this stuff.  But the stock and trade of Google is people

14   clicking on there, because they think that they're going to get

15   the most relevant, in descending order of relevance, with

16   respect to their search.

17           THE COURT:  Well, I think that's interesting.

18           MR. BRIGHT:  And if you're searching a generic term

19   like "vacuum hair system," or if you're looking in the Yellow

20   Pages, or if you're walking down an aisle in the store that

21   says "pain relievers," I understand you're going to be

22   bombarded with products.  But when you pick up a box of

23   Advil --

24           THE COURT:  But even those products pay for their

25   placement in the stores.

1          MR. BRIGHT:  They do indeed.  You walk down the aisle

2   in the store, assuming that you're going to get a number of

3   brands of toothpaste, or, to use this example, a number of

4   brands of pain reliever.

5          THE COURT:  Except for Crest toothpaste and all those

6   tooth -- they pay for their placement in the stores also.

7          MR. BRIGHT:  Unquestionably.  Now, if --

8          THE COURT:  So placement, so location is important,

9   no matter what.

10         MR. BRIGHT:  I think that's correct.  And if you

11  reach for a box of Crest toothpaste, and what is inside that

12  Crest toothpaste is Ultra Bright, that is rather confusing.

13  And what people are doing is they are Googling "Flowbee," a

14  coined term that refers to one and only one thing in the whole

15  universe.

16         THE COURT:  Okay.

17         MR. BRIGHT:  It's not a generic search.

18         THE COURT:  Thank you.

19         MR. BRIGHT:  And I think that's one of the things

20  that's --

21         THE COURT:  I understand.

22         MR. BRIGHT:  -- rather confusing.

23         THE COURT:  You may both be right.  Who knows?

24         MS. CARUSO:  I'd like to make just a few points --

25         THE COURT:  You may.

1     MS. CARUSO:  -- in response, Your Honor.  Thank you.

2 One is that, you know, Flowbee vacuum hair cutting system, this

3 is one of the things that Mr. Bright just said could be typed

4 in, if someone has only bid on vacuum hair cutting system, and

5 not Flowbee, the fact that vacuum hair cutting system is typed

6 in is going to be part of what drives their ad to show up in

7 response as well.

8     THE COURT:  I can imagine that.

9     MS. CARUSO:  So just, I bring that to your attention

10 because it's not as if, you know, Flowbee can decide, we're

11 going to carve out this realm of words and no one else can be

12 associated with them at all.

13     A couple of other things.  You know, Westlaw you

14 mentioned, and of course, Westlaw charges you for the use of

15 the system.  Google doesn't charge you for the use of the

16 system.  It's paid for by advertising.  So that's --

17     THE COURT:  You all paid for my Westlaw.  Thank you

18 very much.

19     MS. CARUSO:  Yes, Your Honor.  Westlaw charges

20 people.  They don't give it out for free.

21     And just one final thing I'd like to raise, since

22 we're citing evidence that's not before the Court, is that the

23 FTC has issued a letter specifically approving of the use of

24 the term --

25     THE COURT:  This type of use?

1          MS. CARUSO:  -- "sponsored link," as a way to call

2    out to consumers that this is not natural results.

3          THE COURT:  Okay.

4          MS. CARUSO:  That it's something else.  Thank you.

5          THE COURT:  I think I can see why Google hired you.

6    Thank you.  That's it?

7          MR. BRIGHT:  I believe so, Your Honor.

8          THE COURT:  All right.  Thank you all very much.

9          MS. CARUSO:  Thank you.

10          MR. BRIGHT:  Thank you, Your Honor.

11          THE COURT:  You're excused.

12          MR. BRIGHT:  Thank you.

13       (Proceedings concluded at 1:44 p.m.)

14

15

16

17

18    I, court approved transcriber, certify that the foregoing is a
     correct transcript from the official electronic sound recording
19    of the proceedings in the above-entitled matter.

20

21

22
     /s/ Molly Carter                  September 25, 2009
23    Molly Carter                      Date

24

25